2011 UT App 220

**Ron BENSON, Petitioner,**

v.

**PEACE OFFICER STANDARDS AND
TRAINING COUNCIL, Department of
Public Safety, State of Utah, Respondent.**

No. 20080579–CA.

Court of Appeals of Utah.

July 8, 2011.

Phillip W. Dyer and Carey A. Seager, Salt Lake City, for Petitioner.

Mark L. Shurtleff and Brent A. Burnett, Salt Lake City, for Respondent.

Before Judges DAVIS, ORME, and THORNE.

## OPINION

THORNE, Judge:

¶ 1 Petitioner Ron Benson appeals from the Peace Officer Standards and Training (POST) Council's final decision including a finding that Benson had willfully submitted

false information to obtain certified status. We affirm in part and reverse in part.

## BACKGROUND

¶ 2 In 1998, Benson retired after a twenty-year career as a peace officer with the Utah Department of Corrections (Department of Corrections). That same year, Benson accepted a peace officer position as an investigator for the State Department Division of Insurance and Fraud. In 2000, Benson resigned from that position to accept employment in the private sector. In 2003, Benson decided to pursue re-employment with the Department of Corrections. The position required POST certification.

¶ 3 Benson sought POST recertification and contacted a POST technician, Jayme Garn. She informed Benson that he would not require recertification if he had maintained reserve officer status during the period from 2000 to 2004. Benson then contacted his previous supervisor, Leo Lucey, Deputy Director of the Division of Adult Probation and Parole Administration, who provided a memo to Garn (the Lucey Memo) which provided as follows, "Retired officer Ron Benson signed a reserve officer agreement with the Department of Corrections region IV office of adult probation and parole dated 2–9–2000. A copy of that agreement can be provided if needed." Garn thereupon issued a letter, dated October 1, 2003, stating that Benson "is certifiable as a Law Enforcement Officer in the State of Utah as of October 1, 2003. Please advise this office when he has been hired so that we may issue his certification." In February 2004, the Department of Corrections offered Benson employment as a peace officer.

¶ 4 In 2005, a question regarding Benson's status was raised by Department of Corrections personnel. On March 15, 2005, the executive director of the Department of Corrections, Scott Carver, directed Benson to apply for and take the statutory waiver examination to address any perceived concerns. The POST In–Service Director, Jim Keith, reviewed Benson's application and determined that the examination was not necessary and that Benson could reactivate his peace officer certification by submitting his training record for 2004. Benson submitted said information. Upon Keith's direction, Letisha Shelby, a POST technician, issued a letter dated April 26, 2005, to Benson confirming that his peace officer certification was effective as of March 4, 2004.

¶ 5 In 2006, the Utah State Legislature undertook an audit of the Department of Corrections. During the audit, questions arose concerning the accuracy of Benson's reserve officer status and POST certification. An internal investigation demonstrated that there were inconsistencies which would not support his status as a reserve officer during the relevant time period. When applying the statutory provisions governing reserve officers to Benson, see Utah Code Ann. § 53–13–112 (2007), the investigator determined that Benson had not performed as a reserve officer for corrections during the time period 1998 to 2004 and Benson's certification was therefore invalid due to violations of Utah Code section 53–6–208(2), the law governing lapsed peace officer certification. Utah Code section 53–6–208(2) provides that the "certificate of a peace officer lapses if he has not been actively engaged in performing the duties of a peace office for four continuous years" and subject to the section on statutory waiver examination at the director's discretion, see id. § 53–6–206, "the peace officer shall successfully complete the basic training course before the certificate may be reissued or reinstated." Id. § 53–6–208(2)(a)–(b).

¶ 6 In 2007, POST lodged an administrative complaint against Benson wherein Lynne Nelson, Chairman of the Utah Council of POST, alleged that Benson had willfully provided both written and verbal information that was false seeking to obtain certified status in violation of Utah Code section 53–6–211(1)(d)(i) and POST Administrative Rule 728–409–3(A) and requested the refusal of Benson's request for peace officer certification.

¶ 7 Administrative Law Judge Cheryl D. Luke (the ALJ) held a formal hearing on the administrative complaint against Benson. The ALJ found, among other things, that Benson willfully submitted falsified informa-

tion to POST in order to obtain certified status.[1] The ALJ made the following recommendation to the POST Council:

> Mr. Benson was not engaged in the duties of a law enforcement officer from January 1, 2000 to March 2004. His certification lapsed and is subject to the provisions of Utah Code ... [s]ection 53–6–208. The Director of POST has the authority and discretion to allow for reinstatement by waiver exam. In this case the Director of POST has refused reinstatement by waiver exam and the evidence supports the exercise of discretion. POST has met its burden in proving Count I of the Administrative Complaint and the refusal to recertify by waiver is appropriate.[2]

Benson appealed the findings and recommendation to the POST Council. A POST Council meeting was held wherein Sheriff Bud Cox made a motion to accept the ALJ's determination that Benson's POST certification lapsed in January 2004. The motion passed. Thereafter, POST director Scott Stephenson issued a final order adopting the ALJ's recommendation and accepting the ALJ's factual findings including that the ALJ found that Benson "obtained and submitted documents to POST in an effort to counter a finding that [Benson's] certification had lapsed. The ALJ found that [Benson] willfully submitted falsified information to POST to obtain certified status. The Council accepts these findings of fact in support of the Agency Action taken herein."

## ISSUES AND STANDARDS OF REVIEW

■ ¶ 8 Benson argues that POST is estopped from taking any adverse action concerning his peace officer certification because Benson relied on the issuance of the certification and worked for nearly three years thereafter. Equitable estoppel is assertible against the state only in "unusual situations in which it is plainly apparent that failing to apply the rule would result in manifest injustice." *Holland v. Career Serv. Review Bd.,*

856 P.2d 678, 682 (Utah Ct.App.1993). "In such cases, the critical inquiry is whether it appears that the facts may be found with such certainty, and the injustice to be suffered is of sufficient gravity, to invoke the exception." *Id.* (internal quotation marks omitted).

■ ¶ 9 Benson next argues that the POST director erroneously adopted the ALJ's finding that Benson willfully submitted false information to obtain certified status in violation of Utah Code section 53–6–211(1)(d)(i), *see* Utah Code Ann. § 53–6–211(1)(d)(i) (2007), because the ALJ's finding was not supported by a preponderance of the evidence. This issue presents a factual determination that should be overturned on appeal only if substantial evidence fails to support it. *See Martinez v. Media–Paymaster Plus/Church of Jesus Christ of Latter-Day Saints,* 2007 UT 42, ¶¶ 35–36, 164 P.3d 384. "In order to determine whether a decision is supported by substantial evidence, the reviewing court must consider the whole record before the lower court." *Id.* ¶ 36.

■ ¶ 10 Benson also asserts that POST committed reversible error when it failed or refused to rule on Benson's disparate treatment argument. Whether an agency "decided all of the issues requiring resolution is a question of law reviewed for correctness." *Orchard Park Care Ctr. v. Department of Health,* 2009 UT App 284, ¶ 8, 222 P.3d 64 (citation and internal quotation marks omitted); *see also* Utah Code Ann. § 63G–4–403(4)(c) (2008); *EAGALA, Inc. v. Department of Workforce Servs.,* 2007 UT App 43, ¶ 7, 157 P.3d 334.

■ ¶ 11 Benson further asserts that POST abused its discretion and acted contrary to its past practice when it ignored the fact that Benson successfully passed the statutory waiver examination, which cured any alleged certification lapse. "Claims that an agency decision is contrary to the agency's prior practice are ... reviewed to determine

---

1. The ALJ found, in finding number sixteen, that "Mr. Benson engaged in opportunistic exploitation of the lax system in place at the prison. In obtaining and submitting the letter to POST in an effort to counter a finding that his certification

had lapsed he willfully submitted falsified information to POST to obtain certified status."

2. The complaint alleged another count that was ultimately dismissed.

if an inconsistency is justified by a fair and rational basis." *Road Runner Oil, Inc. v. Board of Oil, Gas & Mining*, 2003 UT App 275, ¶ 25, 76 P.3d 692 (internal quotation marks omitted); *see also* Utah Code Ann. § 63G–4–403(4)(h)(iii).

## ANALYSIS

### I. Equitable Estoppel

■ ¶ 12 Benson argues that because POST reactivated his peace officer certification, the agency is now prohibited from refusing or denying him the certification previously issued based on the doctrine of equitable estoppel. "[I]t is well settled that equitable estoppel is only assertible against the State or its institutions in unusual situations in which it is plainly apparent that failing to apply the rule would result in manifest injustice." *Holland v. Career Serv. Review Bd.*, 856 P.2d 678, 682 (Utah Ct.App.1993). Thus, "the critical inquiry is whether it appears that the facts may be found with such certainty, and the injustice to be suffered is of sufficient gravity, to invoke the exception." *Id.* (internal quotation marks omitted). Further, as noted by the supreme court in *Anderson v. Public Service Commission*, 839 P.2d 822 (Utah 1992), " '[t]he few cases in which Utah courts have permitted estoppel against the government have involved very specific written representations by authorized government entities.' " *Holland*, 856 P.2d at 682 (emphasis omitted) (quoting *Anderson*, 839 P.2d at 827).

■ ¶ 13 The elements necessary to invoke equitable estoppel are

(1) a statement, admission, act or failure to act by one party inconsistent with a claim later asserted; (2) reasonable action or inaction by the other party taken on the basis of the first party's statement, admission, act, or failure to act; and (3) injury to the second party that would result from allowing the first party to contradict or repudiate such statement, admission, act, or failure to act.

*Id.* "Estoppel is a doctrine of equity purposed to rescue from a loss a party who has, without fault, been deluded into a course of action by the wrong or neglect of another." *Morgan v. Board of State Lands*, 549 P.2d 695, 697 (Utah 1976). "[A] party who seeks an equitable remedy must have acted in good faith and not in violation of equitable principles." *Hone v. Hone*, 2004 UT App 241, ¶ 7, 95 P.3d 1221.

¶ 14 Applying the above law to the facts of this case, Benson's estoppel claim fails because he has not established with certainty the first two elements of his estoppel claim. Benson asserts that equitable estoppel should be invoked because the facts are clear that POST, a state agency, made a formal written statement regarding Benson's certification, which Benson relied upon and that POST now seeks to repudiate that decision to Benson's detriment. Benson, however, fails to acknowledge his participation in the misunderstanding that he had been a reserve officer during the four-year period in question. It is true that POST issued a statement to the effect that Benson was certifiable as a police officer. This written statement was, however, based on the premise that Benson had been actively engaged in performing peace officer duties by acting as a reserve officer.[3]

---

**3.** In 2003, Benson sought POST recertification and contacted Garn who informed Benson that he would not require recertification if he had maintained reserve officer status during the period from 2000 to 2004. In discussing his employment status, Benson clarified that he was not a current employee at the Department of Corrections and discussed his reserve officer status with Garn. Regarding this fact, Benson testified as follows:

Q ... And what did [Garn] tell you, if anything, that you needed to do [to obtain employment with the Department of Corrections]?
A And I can't remember the conversation verbatim, but it was something to the effect that

with my employment ..., that I was not a current employee at the Department of Corrections, somewhere it came up whether I was a reserve [officer] or not. And I had stated that I did fill out a reserve packet with the Department of Corrections.
Q Did she ask you to give that to her?
A No.
 ....
Q What did she ask you to do?
A She told me I would—that she would need some documentation from the Department of Corrections, someone to tell her that I was a reserve [officer] for the Department of Corrections[.]

¶ 15 At the time Benson sought recertification, he had approximately twenty years experience as a police officer and claimed that he had worked as a reserve officer for the Utah Department of Corrections during the 1998 to 2000 period while he was employed as an investigator for the Insurance Fraud Division. Based on this experience, Benson knew or should have known that he had not actually served as a reserve officer during the time period in question. It was therefore not reasonable for him to give the impression that he had actually been acting in a reserve officer capacity, nor for him to rely upon a recertification issued on that premise. Thus, we cannot conclude that Benson had a good faith belief he was a reserve officer from 2000 to 2004 or that he was without fault in the misunderstanding that supported POST's creation of a formal written statement regarding Benson's eligibility in 2003 for recertification and a statement in 2005 that he was certified on March 3, 2004. *See generally Morgan*, 549 P.2d at 697 n. 4 ("The doctrine of equitable estoppel does not operate in favor of one who has knowledge of the essential facts or who has convenient and available means of obtaining such knowledge."). Therefore, based on Benson's participation in the misunderstanding, we determine that any injustice Benson may have suffered is not of sufficient gravity to invoke equitable estoppel against the state, *see Holland*, 856 P.2d at 682, and thus, conclude that the doctrine of equitable estoppel cannot be applied in this case.

## II. Willfully Submitted False Information Finding

¶ 16 The ALJ found that Benson had engaged in the willful falsification of information under Utah Code section 53–6–211(1)(d)(i) and POST Administrative rule 728–409–3(A) by providing information to POST that he had been working as a reserve officer for the Department of Corrections during the four-year period when in fact he had not. Benson argues that the ALJ's finding that Benson willfully engaged in falsifying information to obtain his certification is not supported by the record as a whole.[4] In so arguing, Benson asserts that he did not himself provide any false information to POST either by an affirmative representation or otherwise, and that he neither obtained nor submitted the Lucey Memo that allegedly contained the false information to POST.

¶ 17 In response, POST asserts that Benson told POST he had served as a reserve officer and that the Lucey Memo submitted to POST contained either false or misleading information. In support of these assertions, POST provides several citations to the transcript of the hearing the ALJ held in this matter. POST first directs our attention to a portion of Benson's testimony POST avers demonstrates that Benson told POST he had served as a reserve officer.[5] The testimony POST cites, provides as follows:

....

Q .... And in response to that, what did you do in follow up?

....

A So I originally went to Lyle Wilde and talked with Lyle. Lyle told me I needed to talk to—I don't know if he referred me to Leo [Lucey] or if he told me I needed to talk to somebody else, because he couldn't recall getting the packet from me.

....

Q Okay. So what did you do next?

A So then I contacted Mr. Lucey and I informed him of the conversation I had with Ms. Garn, asked him if he would contact her and determine what exactly it was she needed.

Lucey then provided a letter to Garn stating "Retired officer Ron Benson signed a reserve officer agreement with the Department of Corrections region IV office of adult probation and parole dated 2–9–2000." Thereafter, Garn issued a letter stating that Benson was certifiable as a law enforcement officer.

4. POST argues that Benson failed to adequately marshal the evidence by providing only a list of some of the evidence in support of the ALJ's findings. Although Benson's efforts at marshaling are somewhat incomplete, we exercise our discretion and reach the merits of his argument. *See Martinez v. Media–Paymaster Plus/Church of Jesus Christ of Latter-Day Saints*, 2007 UT 42, ¶¶ 18–21, 164 P.3d 384 ("The reviewing court ... retains discretion to consider independently the whole record and determine if the decision below has adequate factual support.").

5. During oral argument, the attorney for POST represented that Benson's transcript shows that he told POST he had worked as a reserve officer. This court asked the attorney to provide the transcript citation. In compliance with this request, the attorney for POST responded with a

Q ... And what did [Garn] tell you, if anything, that you needed to do [to obtain employment with the Department of Corrections]?

A And I can't remember the conversation verbatim but it was something to the effect that with my employment-after we got through the employment issue, that I was not a current employee at the Department of Corrections, somewhere it came up whether I was a reserve [officer] or not. *And I had stated that I did fill out a reserve packet with the Department of Corrections.*

(Emphasis added.) Although this testimony may demonstrate that Benson's statements to Garn were misleading, it does not amount to a willful falsification of information such as an affirmative statement from Benson that he had worked as a reserve officer. Instead, Benson's statement accurately, albeit misleadingly, informed POST that he had filled out a reserve packet. As such, said testimony does not alone support a finding that Benson willfully provided falsified information by affirmatively representing his reserve officer status.

¶ 18 POST next asserts that the Lucey Memo contains false information regarding Benson's reserve officer status and is evidence that Benson willfully supplied falsified information by obtaining and submitting the memo to POST. The Lucey Memo, in its entirety, provides as follows: "Retired officer Ron Benson signed a reserve officer agreement with the Department of Corrections region IV office of adult probation and parole dated 2–9–2000. A copy of that agreement can be provided if needed. Thank you for your time and please advise if you need anything else." POST argues that the first sentence in the memo is false because Lucey did not know if Benson had ever signed the reserve officer agreement and did not know if Benson had made an agreement with region IV to serve as a reserve officer.

¶ 19 Even if we were to assume that the Lucey Memo contains inaccurate or misleading information, this does not, in and of itself, demonstrate that Benson provided falsified information to POST. To begin with, there is no evidence that Benson directed Lucey to write that particular statement. Instead, the testimony of both Benson and Lucey provides that Lucey, at Benson's request, contacted Garn to determine what information she needed regarding Benson's reserve officer status.[6] Lucey further testified that subsequent to his discussion with Garn he drafted the memo based on his own understanding of Benson's reserve officer status and submitted the memo to POST.[7]

¶ 20 Because there is no clear evidence to show that Benson affirmatively represented to POST that he had worked as a reserve officer, participated in the drafting of the Lucey Memo, or submitted the memo himself, we conclude that the ALJ's decision does not meet the substantial evidence test. As a result, we reverse the POST Director's specific adoption of the ALJ's willful falsifica-

letter including the relevant citation to the testimony discussed herein.

6. Benson testified that he had contacted Lucey and "informed him of the conversation I had with Ms. Garn, asked him if he would contact her and determine what exactly it was she needed." Lucey testified that

[Benson] called me and said that POST needed some information. He wasn't sure what they needed and asked me if I was willing to provide whatever information they needed. I asked him for a name and a phone number of somebody at POST to call to find out what information it was they wanted and he provided me that name and number.

....

I called [Garn], identified myself, told her that [Benson] had contacted me and asked her what—what information it was they were looking for. And she told me whatever information I had with regard to his reserve status. I went through in detail with her what information I had, which wasn't a great deal, other than the packet, that he got the packet from me and filled out at least part of it in my office. We had that conversation, and a fairly lengthy conversation as to what I could or could not provide her information on.

7. There is, however, testimonial evidence that Benson supplied Lucey with the date on the reserve officer packet. Lucey testified that during his conversation with Garn, she requested this information and Lucey told her that he would have to get the date from Benson. Lucey further testified that he obtained the date from Benson.

tion of information finding.[8]

¶ 21 Our conclusion that the willful finding was erroneously adopted, however, does not resolve the certification issue. The evidence is quite clear that Benson had not worked as a reserve officer during the four-year period in question and as such his certification had lapsed. The Department of Corrections has very specific rules regulating reserve officer status that include conditions that the reserve officer take an oath, receive a monthly stipend, have a badge issued, and be assigned a supervisor. Regarding his reserve officer activities from 2000 to 2004, Benson had no supervision, was not in contact with anybody from the Department of Corrections regarding his duties as a reserve officer, was not paid a stipend, had not worked for region IV, and could recall only one instance of passing on information to one person in the Department of Corrections during the four-year period in question.[9] In addition, Lyle Wilde, the supervisor of region IV, the office identified in the Lucey Memo as the office Benson would work under, testified that Benson "didn't work for me as a reserve officer." This evidence supports the ALJ's determination that Benson was not engaged as a reserve officer from January 2000 to March 2004. As a result, we affirm the ALJ's finding that Benson's certification lapsed. *See* Utah Code Ann. § 53–6–208(2)(a) (2007) ("The certificate of a peace officer lapses if he has not been actively engaged in performing the duties of a peace officer for four continuous years.").

### III. Disparate Treatment

¶ 22 Benson next argues that POST committed reversible error when it failed or refused to rule on Benson's disparate treatment argument that he was subjected to adverse action for circumstances surrounding his reserve office status, i.e., denied recertification, while Lucey, who wrote and submitted the memo pertaining to Benson's reserve officer status, was not similarly denied recertification. Utah Code section 63G–4–403(4)(c) provides that "[t]he appellate court shall grant relief only if ... it determines that a person seeking judicial review has been substantially prejudiced [because] ... the agency has not decided all of the issues requiring resolution." Utah Code Ann. § 63G–4–403(4)(c) (2008); *Orchard Park Care Ctr. v. Department of Health*, 2009 UT App 284, ¶ 12, 222 P.3d 64.

¶ 23 Although it appears that POST failed to address Benson's disparate treatment argument, we conclude that this failure did not substantially prejudice Benson because he did not carry the burden of showing some meaningful disparity of treatment between himself and other similarly situated employees. "Meaningful disparate treatment can only be found when similar factual circumstances led to a different result without explanation." *Kelly v. Salt Lake City Civil Serv. Comm'n*, 2000 UT App 235, ¶ 31, 8 P.3d 1048. Benson argues that he received disparate treatment because Lucey was not subjected to the same penalty, the loss of his peace officer certification, for his actions relating to Benson's reserve officer status, i.e., writing and submitting a false memo to POST. However, there is no showing that Benson and Lucey are actually similarly situated. Benson's certification was refused because POST found that Benson's certification had lapsed.[10] There is no claim that Lucey's

---

8. In a related argument, Benson asserts that the POST Director exceeded the limited and narrow decision of the POST Council by adopting the ALJ's willfully submitted falsified information finding. Because we reverse this finding based on insufficient evidence, we need not decide whether the POST Director exceeded his discretion.

9. Benson also testified that when he acted as a reserve officer in 1998 and 1999, he was not required to go through training, was not paid a stipend, and was not given a badge. This time period is not subject to review here but appears to suffer from the same infirmities as the 2000 to 2004 period.

10. After the hearing, the ALJ stated in her recommendation that "Benson was not engaged in the duties of a law enforcement officer from January 1, 2000 to March 2004. His certification lapsed and is subject to the provisions of Utah Code ... [s]ection 53–6–208." Benson appealed the recommended order to the POST Council. The POST Council held a meeting and affirmed and adopted the ALJ's recommendation that Benson's peace officer certification lapsed in January 2004.

certification had lapsed or that he was otherwise erroneously recertified after retirement and lapse as Benson had been. Because Benson did not demonstrate that he and Lucey are similarly situated his disparate treatment argument fails and, we conclude that Benson was not substantially prejudiced by the ALJ's failure to address this argument.[11]

## IV. POST's Departure from Prior Practice Regarding Statutory Waiver Exams

▪ ¶24 Benson next argues that because POST has allowed other peace officers who have let their certification lapse recertify by means of the statutory waiver exam, POST acted contrary to its prior practice when it ignored Benson's successful passing of the statutory waiver exam. Utah Code section 63G-4-403(4)(h)(iii) provides,

the appellate court shall grant relief only if ... it determines that a person seeking judicial review has been substantially prejudiced [because] ... the agency action is ... contrary to the agency's prior practice, unless the agency justifies the inconsistency by giving facts and reasons that demonstrate a fair and rational basis for the inconsistency.

Utah Code Ann. § 63G-4-403(4)(h)(iii). To succeed, Benson must establish a prima facie case that the administrative agency's action in his case was "contrary to the agency's prior practice." *See id.* If Benson " 'establish[es] this prima facie case by a preponderance of the evidence,' " *Taylor v. Department of Commerce*, 952 P.2d 1090, 1095 (Utah Ct.App.1998) (quoting *Pickett v. Utah Dep't of Commerce*, 858 P.2d 187, 191 (Utah Ct. App.1993)), the burden then shifts to the agency to " 'demonstrate a fair and rational basis' for the departure from precedent in the instant case." *Id.* (quoting *Pickett*, 858 P.2d at 191).

¶25 In support of his contention that POST acted inconsistently, Benson points to the testimony of two witnesses who aver that POST permitted other officers to take the statutory waiver examination after the officers had experienced more than a four-year lapse in law enforcement service.[12] We first note that the circumstances surrounding Benson's taking the statutory waiver exam are different than that of the other officers. Shortly before Benson successfully passed the statutory waiver exam the Utah State Legislature had undertaken an audit of the personnel practices of the Department of Corrections. The audit revealed that the Department of Corrections had not been compliant with the training statute and its own policies covering reserve officers and disciplinary actions.[13] The audit also revealed that many employees believed that

---

**11.** Benson, in his brief, makes mention of the fact that during the course of the evidentiary hearing the ALJ refused to listen to testimony related to this issue. Benson does not, however, assert nor do we conclude that this resulted in an inadequate record of evidence pertaining to the similarly situated prong of Benson's disparate treatment argument. The testimony Benson's attorney attempted to elicit pertained to whether Lucey had been charged with falsification of records, which does not constitute the basis of our determination of this issue.

**12.** Michael Hanks testified at the ALJ hearing that he had retired from law enforcement for approximately seven years and allowed his certification to lapse. Hanks further testified that POST permitted him, in 1997, to take the statutory waiver examination despite the lapse and renew his employment with the Department of Corrections. Lieutenant Steven Winward testified that he was aware that POST had permitted another officer with a lapsed certification to take the waiver exam.

Q .... Did you do any investigation as to what the practice had been at POST prior to

your taking your current position regarding allowing people to take the waiver test?

A I know that there had been individuals—an individual that is close to the four years that has a job pending, they have been able to come and talk to the director and the director has been able to waive time or give them a leeway of time to take that ... reactivation test.

Q Okay. And—so you're aware of someone actually taking the waiver exam beyond four years?

A I can't name any right offhand because it's very rare that that happens.

Q Sure. But you do recall that?

A I recall that. I mean, we've done it for the one year.

Q Okay. What about beyond four? Have you done-do you recall any beyond four.

A I don't recall specifically anybody (inaudible).

**13.** The audit report stated that "[s]ix percent (107) of the department's peace officers and correctional officers did not meet training requirements for the fiscal year 2005," and that the

there was an underlying culture of unfairness and favoritism within the department. A report of the audit, dated December 2006, identified instances of favoritism including the hiring of Benson.[14] The audit report recommended that the Department of Corrections "management apply department standards and policies equitably among all employees throughout the organization, inclusive of administrators." Thereafter, in January 2007, Benson took and passed the statutory waiver examination. Benson has identified no instances where POST, contrary to the audit report directions to equitably apply department standards and policies, has allowed any other individual with more than a four-year lapse in law enforcement services to take the statutory waiver examination since the audit. As such, we conclude that Benson has not established a prima facie case that POST's decision was contrary to its prior practice in light of current statutory requirements.[15] Administrative Code Rule 728–407–4 sets a time limit for the statutory waiver exam. It states that "Applicants who have been certified ... law enforcement officers and who *do not exceed four years* from the time of their certified status and the time they can complete the waiver process *may* be eligible for waiver." Utah Admin. Code R728–407–4(A) (emphasis added). It appears that the director has discretion to disallow the exam under Utah Code section 53–6–206, which provides "[t]he director may waive the required basic peace officer training and certify each applicant who passes a written examination, an oral examination, or both ... that affirms the applicant's ability in law enforcement." Utah Code Ann. § 53–6–206 (2007). By the time Benson took and passed the statutory waiver exam, he had exceeded the time limit to qualify for the exam. Nor has he demonstrated an abuse of discretion when the director chose not to waive the basic training requirement.

Division of Corrections "is also not compliant with its own policies over reserve officers and disciplinary actions."

14. The audit report does not identify Benson by name. The report does, however, provide explicit details of the circumstances of the hiring, such as to include the time line of Benson's retirement and hiring, sufficient to demonstrate that the investigated employee is indeed Benson.

## CONCLUSION

¶ 26 Benson's equitable estoppel claim fails because of his participation in the misunderstanding that lead POST to issue a statement declaring that Benson was certifiable as a police officer. *See Morgan v. Board of State Lands*, 549 P.2d 695, 697 (Utah 1976) ("Estoppel is a doctrine of equity purposed to rescue from a loss a party who has, without fault, been deluded into a course of action by the wrong or neglect of another."). Based on Benson's participation, we cannot conclude that a failure to apply the equitable estoppel rule would result in manifest injustice, as is necessary to assert the rule against the state. *See Holland v. Career Serv. Review Bd.*, 856 P.2d 678, 682 (Utah Ct.App.1993) (providing that equitable estoppel is assertable against the state only in "unusual situations in which it is plainly apparent that failing to apply the rule would result in manifest injustice").

¶ 27 Benson, however, has prevailed in his argument that the ALJ's finding that he willfully engaged in falsifying information to obtain his certification is not supported by the record. There is no record evidence to demonstrate that Benson either affirmatively represented he had served as a reserve officer or that he supplied falsified information by obtaining and submitting the Lucey Memo to POST. The evidence, at most, shows that Benson's statements to POST were misleading. Such actions do not support a finding of willful falsification of information. As a result, we reverse the ALJ's willfully falsification of information finding. Nonetheless, we affirm the ALJ's finding that Benson's certification lapsed. Testimony from the region IV supervisor and Benson clearly establish that Benson had not, in fact, worked as a reserve officer during the four-year period in question.

15. Even if we were to conclude that Benson had established a prima facie case that POST acted contrary to its prior practice when it disregarded Benson's successfully passing the statutory waiver examination, we conclude that POST has a "fair and rational basis" for its action in that it was seeking to correct prior internal inconsistencies and apply department standards and policies in compliance with recent legislative audit recommendations.

¶ 28 Benson argues that POST committed reversible error when it failed or refused to rule on his disparate treatment argument that he was denied recertification based on his representations regarding his reserve office status while Lucey who wrote and submitted the allegedly false memo was not denied recertification. Here, Benson was denied recertification based on the fact that his certification had lapsed. There is no evidence or argument that Lucey's certification had similarly lapsed. Thus, the fact that Lucey has not been denied recertification in similar circumstances does not demonstrate that Benson received disparate treatment and his disparate treatment argument therefore fails. Because Benson's argument fails he cannot demonstrate that he was substantially prejudiced by the ALJ's failure to address this argument.

¶ 29 Benson also argues that POST acted contrary to its prior practice regarding statutory waiver exams when POST ignored Benson's successful passing of the exam. POST's refusal to accept Benson's exam results followed the 2006 audit report recommendation that the Department of Corrections needed to equitably apply department standards and policies. Benson has identified no instance where POST acted contrary to this recommendation and currently applicable statutory regulations. As such Benson has not established a prima facie case that POST's decision was contrary to its prior practice or without a rational basis. Accordingly, we do not disturb the ALJ's decision that POST has the authority and discretion to refuse to allow Benson reinstatement by statutory waiver exam.

¶ 30 Based on the foregoing, we reverse the ALJ's finding that Benson willfully falsified information and affirm the finding that Benson's certification had lapsed and the determination not to recertify Benson.

¶ 31 I CONCUR: JAMES Z. DAVIS, Presiding Judge.

¶ 32 I CONCUR IN THE RESULT: GREGORY K. ORME, Judge.